**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**     **OFFICE COPY**

| | |
|---|---|
| In re GOLDMAN SACHS MUTUAL FUNDS FEE LITIGATION | ) ) ) |
| | ) MASTER FILE: 04-cv-2567 (NRB) |
| THIS DOCUMENT APPLIES TO:  ALL ACTIONS | ) ) ) |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included a review of United States Securities and Exchange Commission

("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, media

reports, news articles, academic literature and academic studies.  Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## INTRODUCTION

1.    This is a federal class action based upon the charging of excessive and

inappropriate fees and expenses to Goldman Sachs mutual fund investors by The Goldman Sachs

Group, Inc. ("Defendants"), and those of its subsidiaries and affiliates also named herein as

Defendants.  Defendants then used these fees, in part, to improperly pay and induce brokerage

firms to steer more investors into Goldman Sachs mutual funds (the "Goldman Sachs Funds" or

the "Funds").  As a result of their material misrepresentations and omissions and/or other

conduct detailed below, Defendants are liable for violations of the Investment Company Act of

1940 (the "Investment Company Act"); the Investment Advisers Act of 1940 (the "Investment

Advisers Act"); and for unjust enrichment to a class (the "Class") of all persons or entities who

held one or more shares of Goldman Sachs Funds, set forth in Exhibit A attached hereto, during

the period April 2, 1999 and ending January 9, 2004 (the "Class Period").

2.    In essence, Defendants used Goldman Sachs Funds investor assets to pay kickbacks to brokerages in exchange for the brokerages steering their clients into Goldman Sachs Funds. Defendants referred to this as buying "shelf-space" at the brokerages whereby they made undisclosed and improper payments to brokerages including Edward D. Jones & Co. ("Edward Jones"), Salomon Smith Barney, Merrill Lynch and Wachovia Securities to induce them to direct investors into Goldman Sachs Funds. Then, once invested in Goldman Sachs Funds, investors were charged and paid undisclosed fees to Defendants that were improperly used by the Defendants to pay brokers to push Goldman Sachs Funds on still more investors in order to increase the level of investments in Goldman Sachs Funds.

3.    Defendants' practice of charging excessive fees and commissions to Goldman Sachs Funds investors to pay and induce brokers to steer investors into the Goldman Sachs Funds necessarily created insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but in fact were only concerned with their pay-offs from Goldman Sachs.

4.    The practice of charging excessive fees and commissions also created insurmountable conflicts of interest for the investment advisers to the Goldman Sachs Funds who had a duty to act in the best interests of fund investors, but were, in fact, only concerned with siphoning fees from the fund investors to induce brokers to artificially increase the amount of money invested in Goldman Sachs Funds. Goldman Sachs was motivated to engage in this undisclosed plan of charging excessive fees to induce brokers to steer investors into Goldman Sachs Funds because the fees it collected for managing and advising the Goldman Sachs Funds were calculated as a percentage of the funds value and, therefore, tended to increase as the number of Goldman Sachs Funds investors grew. For example, as stated in a Goldman Sachs annual report on Form 10-K filed with the SEC for fiscal year ended November 29, 2002, asset

management revenues, which include investment advisory fees, were as follows: $4,592,000,000 in 2000, $5,626,000,000 in 2001 and $5,907,000,000 in 2002. *See* http://www.sec.gov/Archives/edgar/ data/886982/000095012303002099/y83718e10vk.htm. This increase in asset management and advisory fee revenues was due to an overall increase in average managed assets during this period. The Investment Adviser Defendants (as defined herein) attempted to justify this conduct on the ground that by increasing the Goldman Sachs Funds assets it was creating economies of scale that inured to the benefit of investors but, in truth and in fact, Goldman Sachs Funds investors received none of the benefits of these purported economies of scale. Rather, fees and costs associated with the Goldman Sachs Funds steadily increased during the Class Period, in large part because the Investment Adviser Defendants continued to skim from the Goldman Sachs Funds to finance its ongoing marketing campaign. The Goldman Sachs Funds trustees and officers, who purported to be Goldman Sachs Funds investor watchdogs, knowingly or recklessly permitted this conduct to occur.

5.      Defendants purposely omitted disclosing the nature of the improper excessive fees and commissions charged to Plaintiffs and other members of the Class. The Defendants concealed such fees used to induce brokers to push Goldman Sachs Funds as they realized that the inducements created insurmountable conflicts of interest significant to any reasonable person deciding how to invest his or her money.

6.      In actions to date against Morgan Stanley DW, Inc. ("Morgan Stanley"), Edward Jones, Massachusetts Financial Services ("MFS"), Franklin Advisors, Inc., Franklin Templeton Distributors, Inc., and certain PIMCO entities, among others, the SEC has condemned the practices complained about here, stating that they create insurmountable conflicts of interest in violation of the securities laws. In particular, in the action against Morgan Stanley, the SEC stated:

> This matter arises from Morgan Stanley DW's failure to disclose adequately certain material facts to its customers…[namely that] it collected from a select group of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments.

> *        *        *

> Although the Asset Retention Program and Partners funds' prospectuses and SAIs [Statements of Additional Information] contain various disclosures concerning payments to the broker-dealers distributing their funds, none adequately disclose the preferred programs as such, nor do most provide sufficient facts about the preferred programs for investors to appreciate the dimension of the conflicts of interest inherent in them. For example, none of the prospectuses specifically discloses that Morgan Stanley DW receives payments from the fund complexes, that the fund complexes send portfolio brokerage commissions to Morgan Stanley DW or Morgan Stanley & Co. in exchange for enhanced sales and marketing, nor do they describe for investors the various marketing advantages provided through the programs.

*See* the November 17, 2003 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of Morgan Stanley DW, Inc. (the "Morgan Stanley SEC Cease-and-Desist Order"), *at* http://www.sec.gov/litigation/admin/33-8339.htm.

7.        The SEC concluded that such conduct violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), among other statutes, that prohibits one from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they made, not misleading." *Id.*

8.        In a similar enforcement action, the NASD also condemned the practices at issue here and concluded that such payments to brokerages violated NASD Rule 2830(k) which prohibits the type of directed brokerage paid by Goldman Sachs.

9.        The truth about Goldman Sachs finally emerged on January 9, 2004 when the *Wall Street Journal* revealed a "shelf-space" revenue sharing scheme between the broker Edward Jones and Goldman Sachs. The *Wall Street Journal* exposed Goldman Sachs' revenue sharing

4

shelf-space program when it reported that Goldman Sachs paid brokers substantial amounts to favor Goldman Sachs when pitching Goldman Sachs funds to customers.  The *Wall Street Journal* specifically noted that:

> Mutual-fund companies are eager to sell their funds through [Edward] Jones because it has more than 9,000 brokers, the fourth-largest such group in the nation. The firm is also a sought-after distributor because its seven-member preferred list is relatively short. The seven [preferred partners includes] Goldman Sachs Group Inc....

10.    The actions of the Goldman Sachs defendants described herein are no different from those already condemned by the SEC and NASD.  As described by Sen. Peter Fitzgerald (R-Ill.) in a January 28, 2004 *Los Angeles Times* article about a Senate committee hearing on mutual funds, the mutual fund industry "is indeed the world's largest skimming operation," tantamount to "'a $7-trillion trough' exploited by fund managers, brokers and other insiders."

### JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a); §§ 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15; CPLR § 349; and the common law.

12.    This Court has jurisdiction over the subject matter of this action pursuant to § 44 of the Investment Company Act, 15 U.S.C. § 80a-43, § 214 of the Investment Advisers Act, 15 U.S.C. § 80b-14;  28 U.S.C. § 1331; 28 U.S.C. § 1367(a); and 28 U.S.C. § 1391(b).

13.    Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District.  Defendant Goldman Sachs is headquartered in this District.

14.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

15.    Plaintiff Lois Burke held during the Class Period and continues to hold shares or units of the Goldman Sachs Internet Tollkeeper Fund and has been damaged by the conduct alleged herein.  A copy of her verification is attached to Exhibit B, submitted herewith.

16.    Plaintiff Marianne Gooris held during the Class Period shares or units of the Goldman Sachs Capital Growth Fund and has been damaged by the conduct alleged herein.

17.    Plaintiff Henry C. Gross held during the Class Period shares or units of the Goldman Sachs Core Large Cap Growth Fund and has been damaged by the conduct alleged herein.

18.    Plaintiffs Josef P. Pokorny and Diana D. Pokorny held during the Class Period and continues to hold shares or units of the Goldman Sachs Research Select Fund and has been damaged by the conduct alleged herein.  A copy of their verification is attached to Exhibit B, submitted herewith.

19.    Plaintiffs Maurice Rosenthal and Arlene Rosenthal held during the Class Period and continue to hold shares or units of the Goldman Sachs Internet Tollkeeper Fund and has been damaged by the conduct alleged herein.  A copy of their verification is attached to Exhibit B, submitted herewith.

**The Parent Company**

20.    Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a leading global investment banking, securities and investment management firm that provides a wide range of services worldwide to a substantial and diversified client base. It sponsors, markets and provides investment-related services to various investment products, including mutual funds. It is one of the largest mutual fund managers in the United States with $375 billion in assets under management as of December 31, 2003.

**The Investment Advisers**

21.    Defendant Goldman Sachs Asset Management, L.P. ("GSAM") (formerly, Goldman Sachs Funds Management, L.P.), a business unit of the Investment Management Division of Goldman Sachs, serves as the Investment Adviser to the Funds. As of September 1, 1999, the Investment Management Division was established as a new operating division of Goldman Sachs and includes GSAM. Goldman Sachs registered as an investment adviser in 1981. The Goldman Sachs Group, L.P., which controlled the Investment Adviser, merged into The Goldman Sachs Group, Inc. as a result of an initial public offering in 1999.

22.    Defendant Goldman Sachs Asset Management International ("GSAMI"), a unit of the Investment Management Division of Goldman Sachs, serves as investment adviser to certain of the Goldman Sachs Funds. As a company with unlimited liability under the laws of England, GSAMI is regulated by the Investment Management Regulatory Organization Limited, a United Kingdom self-regulatory organization, in the conduct of its investment advisory business. GSAMI is located at Procession House, 55 Ludgate Hill, London, England EC4M 7JW.

23.    Defendants GSAM and GSAMI are herein referred to as the "Investment Adviser Defendants." Investment management fees payable to the Investment Adviser Defendants are

7

calculated as a percentage of fund assets under management. The Investment Adviser Defendants provide day-to-day advice regarding the Fund's portfolio transactions.

**Trustees and Officers**

24.    During the Class Period, defendant Ashok N. Bakhru ("Bakhru") was Chairman of the Board of Trustees charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. For his service as Chairman and Trustee overseeing the Goldman Sachs Mutual Fund complex, Bakhru received compensation of $154,286 for the fiscal year ended August 31, 2002. Bakhru violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

25.    During the Class Period, defendant Patrick T. Harker ("Harker") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. For his service as Trustee or Officer overseeing the Goldman Sachs Mutual Fund complex, Harker received compensation of $114,847 for the fiscal year ended August 31, 2002. Harker violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

26.    During the Class Period, defendant Mary P. McPherson ("McPherson") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. For her service as Trustee or Officer overseeing the Goldman Sachs Mutual Fund complex, McPherson received compensation of $114,847 for the fiscal year ended August 31, 2002. McPherson violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

8

27.    During the Class Period, defendant Wilma J. Smelcer ("Smelcer") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. For her service as Trustee or Officer overseeing the Goldman Sachs Mutual Fund complex, Smelcer received compensation of $114,847 for the fiscal year ended August 31, 2002. Smelcer violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

28.    During the Class Period, defendant Richard P. Strubel ("Strubel") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. For his service as Trustee or Officer overseeing the Goldman Sachs Mutual Fund complex, Strubel received compensation of $114,847 for the fiscal year ended August 31, 2002. Strubel violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

29.    During the Class Period, defendant Gary D. Black ("Black") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. Additionally, Black served as a Managing Director of Goldman Sachs during the Class Period, and is an "interested person" as defined in the Investment Company Act. Black violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

30.    During the Class Period, defendant James McNamara ("McNamara") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. Additionally, McNamara served as a

Managing Director of Goldman Sachs and as Vice President of the Goldman Sachs Mutual Fund Complex during the Class Period. He also served as Director of Institutional Fund Sales for GSAM until December 2000. He is an "interested person" as defined in the Investment Company Act. McNamara violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

31.    During the Class Period, defendant Alan A. Shuch ("Shuch") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. Additionally, Shuch served as an Advisory Director of GSAM during the Class Period. He also served as a consultant to GSAM and a Limited Partner of Goldman Sachs until May 1999. He is an "interested person" as defined in the Investment Company Act. Shuch violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

32.    During the Class Period, defendant Kaysie P. Uniacke ("Uniacke") was a Trustee or Officer charged with overseeing at least 53 portfolios that made up the Goldman Sachs Mutual Fund complex during the Class Period. Additionally, Uniacke served as a Managing Director of GSAM and President of the Goldman Sachs Mutual Fund complex during the Class Period. She also served as an Assistant Secretary to the Goldman Sachs Mutual Fund complex until 2002. She is an "interested person" as defined in the Investment Company Act. Uniacke violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

33.    During the Class Period, defendant John M. Perlowski ("Perlowski") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within

10

the Goldman Sachs Mutual Fund complex. Additionally, Perlowski served as Treasurer of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Perlowski violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

34.    During the Class Period, defendant Philip V. Giuca, Jr. ("Giuca") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Giuca served as Assistant Treasurer of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Giuca violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

35.    During the Class Period, defendant Peter Fortner ("Fortner") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Fortner served as Assistant Treasurer of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Fortner violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

36.    During the Class Period, defendant Kenneth G. Curran ("Kenneth Curran") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Kenneth Curran served as Assistant Treasurer of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Kenneth Curran violated his fiduciary duties to the Funds and the Funds

11

investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

37.    During the Class Period, defendant James A. Fitzpatrick ("Fitzpatrick") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Fitzpatrick served as Vice President of the Goldman Sachs Mutual Fund complex and a Managing Director of Goldman Sachs during the Class Period. He also served as Vice President of GSAM until December 1999. Fitzpatrick violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

38.    During the Class Period, defendant Jesse Cole ("Cole") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Cole served as Vice President of the Goldman Sachs Mutual Fund complex and Vice President of GSAM during the Class Period. Cole violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

39.    During the Class Period, defendant Kerry K. Daniels ("Daniels") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Daniels served as Vice President of the Goldman Sachs Mutual Fund complex and Manager of Financial Control in the Shareholder Services division of Goldman Sachs during the Class Period. Daniels violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

40.    During the Class Period, defendant Mary F. Hoppa ("Hoppa") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the

12

Goldman Sachs Mutual Fund complex. Additionally, Hoppa served as Vice President of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Hoppa violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

41.    During the Class Period, defendant Christopher Keller ("Keller") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Keller served as Vice President of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Keller violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

42.    During the Class Period, defendant Howard B. Surloff ("Surloff") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Surloff served as a Secretary of the Goldman Sachs Mutual Fund complex, a Managing Director and Associate General Counsel of Goldman Sachs during the Class Period. He also previously served as an Assistant Secretary in the Goldman Sachs Mutual Fund complex. Surloff violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

43.    During the Class Period, defendant Dave Fishman ("Fishman") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Fishman served as Assistant Secretary of the Goldman Sachs Mutual Fund complex and a Managing Director of Goldman Sachs during the Class Period. He also previously served as a Vice President of Goldman Sachs until December 2001. Fishman violated his fiduciary duties to the Funds and the Funds investors by

13

knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

44.    During the Class Period, defendant Danny Burke ("Burke") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Burke served as Assistant Secretary of the Goldman Sachs Mutual Fund complex and Vice President of Goldman Sachs during the Class Period. Burke violated his fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

45.    During the Class Period, defendant Elizabeth D. Anderson ("Anderson") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Anderson served as Assistant Secretary of the Goldman Sachs Mutual Fund complex and Fund Manager of GSAM during the Class Period. Anderson violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

46.    During the Class Period, defendant Amy E. Curran ("Amy Curran") was a Trustee or Officer charged with supervising the daily business operations of mutual funds within the Goldman Sachs Mutual Fund complex. Additionally, Amy Curran served as Assistant Secretary of the Goldman Sachs Mutual Fund complex, Vice President and Assistant General Counsel of Goldman Sachs during the Class Period. She also served as Counsel to Goldman Sachs until 2000. Amy Curran violated her fiduciary duties to the Funds and the Funds investors by knowingly and recklessly participating in, approving, and/or allowing the conduct complained of herein.

47.     Defendants Bakhru, Harker, McPherson, Smelcer, Strubel, Black, McNamara, Shuch, Uniacke, Perlowski, Giuca, Fortner, Kenneth Curran, Fitzpatrick, Cole, Daniels, Hoppa, Keller, Surloff, Fishman, Burke, Anderson and Amy Curran are referred to collectively herein as the "Trustee/Officer Defendants."

### The John Doe Defendants

48.     Defendants John Does 1-100 are other wrongdoers whose identities have yet to be ascertained and which will be determined during the course of Plaintiffs' counsel's ongoing investigation.

### The Distributor

49.     During the Class Period, defendant Goldman, Sachs & Co. (the "Distributor" or the "Distributor Defendant") served as the exclusive distributor of shares of the Funds pursuant to a "best efforts" arrangement as provided by a distribution agreement with the Trust on behalf of each Fund.  Shares of the Funds are offered and sold on a continuous basis by Goldman Sachs, acting as agent.  The Distributor also served as the transfer agent for certain Goldman Sachs Funds, and as such performed various shareholder servicing functions.  The Distributor Defendant is located at 85 Broad Street, New York, New York 10004.

### Nominal Defendants: The Goldman Sachs Funds

50.     Nominal defendants, the Goldman Sachs Funds, as identified on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders.  The Funds' Registrants, defined herein, have a Board of Trustees charged with representing the interests of the shareholders in the Funds.  The Goldman Sachs Funds are named as nominal defendants solely to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

51.    The Funds' Registrants are the Goldman Sachs Trust and the Goldman Sachs Variable Insurance Trust (collectively referred to herein as the "Registrants" or the "Trusts"). The Goldman Sachs Trust is organized as a Delaware business trust established by a Declaration of Trust. The Trust is a successor to a Massachusetts business trust that was combined with the Trust. The Goldman Sachs Variable Insurance Trust is also an open-end, management investment company which was formed under the laws of the state of Delaware. Each Fund is a series of the respective Trust, and the Trustees of each Trust have authority under the Trust's charter to create and classify shares into separate series and to classify and reclassify any series or portfolio of shares into one or more classes without further action by shareholders. Pursuant thereto, the Trustees have created the Funds and other series. Additional series may be added in the future from time to time.

52.    All the Goldman Sachs Funds are essentially alter egos of one another. The Goldman Sachs Funds are mainly pools of investor assets that are managed and administered by officers and employees of Goldman Sachs, not by Fund employees who are independent of Goldman Sachs. The Goldman Sachs Funds' Registrants share a common Board of Trustees, officers and employees of Goldman Sachs who administer the Goldman Sachs Funds and portfolios generally, and are not limited to individual Goldman Sachs Funds. Individual Goldman Sachs Funds have no independent will and are totally dominated by Goldman Sachs and the common body of trustees of the Registrants established by Goldman Sachs. In substance, the Goldman Sachs Funds function as components of one unitary organization.

53.    All Goldman Sachs Funds share one of the Investment Adviser Defendants as their investment adviser, and share Goldman Sachs as their distributor and transfer agent. Additionally, Goldman Sachs pools together fees and expenses collected from the Goldman Sachs Funds investors, resulting in the Goldman Sachs Funds sharing expenses with one another.

16

The Statement of Additional Information, dated December 20, 2002, made available to Goldman Sachs Funds investors upon request for the funds offered by Goldman Sachs Trust, which includes the various classes of funds including the Goldman Sachs Capital Growth Fund and the Goldman Sachs Core Large Cap Growth Fund (the "SAI"), and is identical in substance to all Goldman Sachs SAIs issued during the Class Period, describes how costs for research services are commingled and shared by the various Funds:

> **The Trust, on behalf of each Fund, is responsible for the payment of each Fund's respective expenses.** The expenses include, without limitation, the fees payable to the Investment Advisers, service fees and shareholder administration fees paid to Service Organizations, the fees and expenses of the Trust's custodian and subcustodians, transfer agent fees, brokerage fees and commissions, filing fees for the registration or qualification of the Trust's shares under federal or state securities laws, expenses of the organization of the Trust, fees and expenses incurred by the Trust in connection with membership in investment company organizations, taxes, interest, costs of liability insurance, fidelity bonds or indemnification, any costs, expenses or losses arising out of any liability of, or claim for damages or other relief asserted against, the Trust for violation of any law, legal and auditing fees and expenses (including the cost of legal and certain accounting services rendered by employees of GSAM, GSAMI and Goldman Sachs with respect to the Trust), expenses of preparing and setting in type prospectuses, statements of additional information, proxy material, reports and notices and the printing and distributing of the same to the Trust's shareholders and regulatory authorities, any expenses assumed by a Fund pursuant to its Distribution and Service Plans, compensation and expenses of its "non-interested" Trustees and extraordinary expenses, if any, incurred by the Trust. Except for fees under any service plan, shareholder administration plan or distribution and service plans applicable to a particular class and transfer agency fees and expenses, **all Fund expenses are borne on a non-class specific basis.**

[Emphasis added.]

54.    Similarly, the SEC recognized that mutual funds pool fees and expenses when it issued a report in December 2000 titled "Division of Investment Management: Report on Mutual Fund Fees and Expenses." In the report, the SEC noted that "…many fund expenses, including

17

the management fee, are incurred at the portfolio level and then allocated among a fund's classes typically based on the relative net assets of each class."

*See* http://www.sec.gov/news/studies/feestudy.htm.

## SUBSTANTIVE ALLEGATIONS

### DEFENDANTS IMPROPERLY USED INVESTORS' ASSETS TO UNDULY INFLUENCE BROKERS TO PUSH GOLDMAN SACHS MUTUAL FUNDS

#### Defendants Used Improper Means to Acquire "Shelf-Space" at Brokerages

55.    Unbeknownst to Plaintiffs and other members of the Class, Defendants used the assets of its mutual fund investors to participate in "shelf-space" programs at various brokerages, including, but not limited to, Edward Jones, Salomon Smith Barney, Merrill Lynch and Wachovia Securities. These improper *quid pro quo* arrangements were known as buying "shelf-space" at the brokerages. These payments in exchange for "shelf-space" were nothing more than a series of veiled payments by Defendants to have brokers steer unknowing investors into the Goldman Sachs Funds.

56.    These *quid pro quo* "shelf-space" agreements between Defendants and the brokerage firms called for millions of dollars in additional compensation to be paid from Defendants to the brokerages as incentive to steer unwitting investors into the Defendants' Funds, resulting in inflated fees being paid by investors.

57.    The payments for these *quid pro quo* arrangements with brokerage houses came in the form of "revenue sharing payments," "slush funds," improper and excessive "soft dollars," and 12b-1 fees, among other improper inducements. As alleged herein, the 12b-1 fees are assessed directly against shareholders interests, and all these fees reduce the amount by which shareholders are legally entitled to redeem their shares.

18

**Revenue Sharing**

58.     According to a former Goldman Sachs mutual fund wholesaler who worked for Goldman Sachs during the Class Period, Defendants made revenue sharing payments to brokerage houses as part of the *quid pro quo* "shelf-space" arrangements.  In other words, Defendants paid the brokerage houses and their brokers *cash* to push their clients into the Goldman Sachs Funds.  To the extent revenue sharing payments were made in the form of commissions or otherwise, the Investment Advisers recouped these payments through their management fees.

59.     According to both a former investment representative from Edward Jones who sold Goldman Sachs mutual funds during the Class Period and to internal Edward Jones documents from the Class Period, Goldman Sachs paid brokers *cash* to push the Goldman Sachs mutual funds.  Such revenue-sharing payments took a variety of forms.

60.     The most direct form, according to the former Edward Jones investment representative identified in ¶ 59, is that Goldman Sachs would send the brokers checks for pushing the Goldman Sachs Funds.

61.     The second form of revenue sharing payment was funneled through to the broker through the brokerages' management.  This second form of revenue sharing was reflected in the broker compensation statement which had a line-item for the revenue sharing dollars paid to the broker.  Moreover, according to a former broker at Edward Jones who sold Goldman Sachs mutual funds during the Class Period, management at Edward Jones stressed to brokers that Goldman Sachs mutual funds were to be pushed so that Edward Jones could reap as much as possible in revenue sharing dollars from Edward Jones.

62.     Additionally, according to a former Edward Jones investment representative who sold Goldman Sachs Funds during the Class Period, Goldman Sachs would rank brokers on their

19

sales of Goldman Sachs Funds and established a "Blue Chip Council" for those who pushed the most Goldman Sachs Funds. Membership in the "Blue Chip Council" entitled brokers who sold Goldman Sachs Funds to even higher payouts of commissions and revenue sharing.

**Slush Funds**

63.    According to a former investment representative from Edward Jones who sold Goldman Sachs Funds during the Class Period, Goldman Sachs established slush funds to pay brokers to push Goldman Sachs mutual funds. According to this former investment representative, a Goldman Sachs wholesaler was in charge of the slush funds and would regularly make payments out of the fund to brokers who pushed Goldman Sachs Funds.

**Soft Dollars**

64.    In addition to revenue sharing payments and pay-outs from the Goldman Sachs slush fund, Defendants also used soft dollars to pay brokerages to push clients into the Goldman Sachs Funds. Soft dollars reflected the amount of a commission above the actual execution cost.

**Lavish Trips and Exotic Vacations**

65.    In addition to revenue sharing payments, slush fund pay-outs and soft dollars, Goldman Sachs also rewarded brokers that pushed Goldman Sachs mutual funds with lavish trips and exotic vacations. According to a former broker who pushed Goldman Sachs mutual funds during the Class Period, he received lavish trips around the world paid for by Goldman Sachs for his work in pushing Goldman Sachs Funds.

**Goldman Sachs' Improper "Shelf-Space" Arrangements With Edward Jones**

66.    According to numerous former investment representatives who worked at Edward Jones during the Class Period, Goldman Sachs was one of the preferred funds that participated in the "shelf-space program" at Edward Jones. The shelf-space program was nothing more than a vehicle for enabling a series of veiled payments by Goldman Sachs to Edward Jones to steer

20

unknowing investors into Goldman Sachs Funds. ***Under the shelf-space program, Edward Jones brokers improperly and aggressively pushed Goldman Sachs Funds on unwitting clients solely because they received improper incentives from Goldman Sachs to do so, not because such funds were in the best interests of the investors.***

67.    Goldman Sachs paid Edward Jones during the Class Period as part of the *quid pro quo* arrangement with Edward Jones to participate in the shelf-space program. In numerous enforcement actions to date, such payments have been condemned by the SEC as being improper and creating conflicts of interest that were not properly disclosed to investors.

68.    As described by *The Wall Street Journal* in a January 9, 2004 article, mutual fund companies found Edward Jones to be an attractive broker to push their mutual funds because Edward Jones customers typically hold their mutual funds for longer periods of time than most mutual fund investors. Mutual fund companies such as Goldman Sachs benefit from such "buy-and-hold" investors because their fees are calculated as a percentage of assets under management, and such long holding periods provide the companies with reliable fee revenue. *The Wall Street Journal* described Edward Jones' attractiveness to mutual fund companies in the following terms:

> Jones has selling agreements with about 100 mutual funds, but 90% to 95% of its fund sales come from the seven preferred companies [including Goldman Sachs] who engage in revenue sharing, according to Boston financial consultants Cerulli Associates. Jones customers are viewed as desirable in the fund industry because many are loyal "buy and hold" investors. On average, Jones has said, they stayed invested in a mutual fund for about 20 years, reliably paying management fees. Financial-services veterans say the industry-wide average is about four years.

Jan. 9, 2004 Wall Street Journal at A1.

69.    According to a former upper-level manager at Edward Jones, Goldman Sachs paid somewhere in the range of 12 to 14 basis points to Edward Jones for a preferred listing and that

21

in addition to basis points, Goldman Sachs made shelf-space payments by also sharing banking and underwriting business with Edward Jones.

70.    Moreover, according to a former investment representative at Edward Jones, the revenue sharing payment system was set up in such a manner that brokers who refused to sell Goldman Sachs Funds were castigated and received less in commission. Consequently, brokers pushed Goldman Sachs mutual funds on unwitting investors. In fact, according to a former Edward Jones branch manager who supervised the sale of Goldman Sachs funds during the Class Period, brokers went as far as to get their clients to liquidate assets in other funds, thereby paying fees and other costs, and then reinvesting in Goldman Sachs mutual funds, as well as other mutual funds that had shelf-space arrangements.

71.    Not only did Edward Jones emphasize selling Goldman Sachs funds, but it also made it difficult to buy non-preferred funds. According to a former Edward Jones broker, Edward Jones had an internal intranet system called View Information System through which brokers had to go to make mutual fund sales. View Information System only reflected mutual funds such as Goldman Sachs Funds that had shelf-space arrangements with Edward Jones. Consequently, it was almost impossible to sell a non-preferred fund because View Information System prevented a broker from entering those orders.

72.    Throughout the Class Period, Edward Jones, Salomon Smith Barney and other brokerages reportedly received approximately $100 million per year for pushing Goldman Sachs and other preferred funds. The effect of these improper payments is evident by the fact that these funds constituted approximately 90% to 95% of the overall fund sales during the Class Period of brokerages such as Edward Jones and Salomon Smith Barney.

**The Investigation of Edward Jones for its Involvement with Goldman Sachs And Other Preferred Partners**

73.     Edward Jones is just one of the brokerage houses to which Goldman Sachs made improper inducement payments in order to have Goldman Sachs funds improperly pushed on investors.  For its role in accepting these payments from Goldman Sachs, among other wrongdoing, Edward Jones is a target of intensive investigations by various government regulators, including, but not limited to, the Securities and Exchange Commission, the U.S. Attorney's Office and a federal grand jury.

74.     Jones Financial has since disclosed in a Form 10-K dated March 19, 2004 that the SEC and NASD are considering enforcement actions against Edward Jones for engaging in the same conduct for which the SEC and NASD previously sanctioned Morgan Stanley.  The March 19, 2004 Form 10-K (the "Form 10-K") stated, *inter alia*, the following:

> **In January 2004, the staff of the SEC informed the Partnership that it is considering recommending enforcement action in connection with the Partnership's mutual fund sales practices.**  The staff advised the Partnership that the proposed action against it would be based upon, among other things, the adequacy of the Partnership's disclosures regarding revenue sharing arrangements with specified investment companies and the Partnership's alleged favored sale or distribution of shares of those investment companies based upon considerations received.

> **Similarly, in January of 2004, the staff of the NASD informed the Partnership that it is considering recommending enforcement action in connection with the Partnership's mutual fund sales practices.**  The staff advised the Partnership that the proposed action would be predicated upon, among other things, (1) the disclosures regarding revenue sharing arrangements with specified investment companies and entities affiliated with certain variable annuity investments were violative of NASD rules; and (2) the receipt of certain directed brokerage commissions by the Partnership and its sponsorship of certain award promotions were violative of other rules of the NASD.

[Emphasis added.]

23

**Goldman Sachs' Improper Shelf-Space Agreements With Salomon Smith Barney, Merrill Lynch and Wachovia Securities**

75.    Edward Jones was not the only brokerage firm that accepted payments from Goldman Sachs in exchange for pushing investors into Goldman Sachs Funds. During the Class Period, Goldman Sachs also made "shelf-space" payments to other major brokerage houses, including Salomon Smith Barney, Merrill Lynch and Wachovia Securities.

76.    Although precise information regarding the total amount Goldman Sachs improperly paid under its multiple revenue-sharing agreements will not be available until discovery begins, information that has been made public shows that tens of millions of dollars would have been paid by Goldman Sachs. For example, Edward Jones has disclosed on its website that its seven preferred fund families paid in aggregate of more than $89 million in revenue-sharing during 2004 alone. Of this total, Goldman Sachs paid $4.1 million.

77.    Regarding the shelf-space payments, Wachovia's website explicitly states that "[a]t Wachovia Securities, we receive payments from many of the companies whose funds we sell." Goldman Sachs Funds are named as one of the mutual fund companies that pays Wachovia Securities. *See* http://www.wachovia.com/files/MutualFund_Guide.pdf. [Emphasis added.]

78.    Similarly, in a June 2004 Salomon Smith Barney press release, Goldman Sachs was identified as paying brokers at Salomon Smith Barney to push Goldman Sachs Funds. *See* http://www.smithbarney.com/products_services/mutual_funds/investor_information/revenueshar e.html. The press release further states that "[f]or each fund family we offer, we seek to collect a mutual fund support fee, or what has come to be called a revenue sharing payment. These revenue sharing payments are in addition to the sales charges, annual service fees (referred to as

"12b-1 fees"), applicable redemption fees and deferred sales charges, and other fees and expenses disclosed in a fund's prospectus fee table." *Id.*

### Defendants Cloaked Their Practices in Secrecy

79.    Defendants knew that these "shelf-space" arrangements present a clear conflict of interest, pitting the financial interest of the broker against that of its clients. Disclosure of this conflict is clearly material if clients are expected to make informed investment decisions. However, knowing that a recommendation to purchase the Goldman Sachs Funds would be completely undermined if clients knew that the broker was paid to give it, Goldman Sachs concealed the truth regarding these revenue sharing arrangements.

### The Truth Is Revealed

80.    On January 9, 2004, the *Wall Street Journal* exposed the relationship between the broker Edward Jones and Goldman Sachs as well as six other mutual funds companies, where the companies paid Edward Jones substantial amounts to favor those companies when pitching funds to customers. In the article, the *Wall Street Journal* detailed Edward Jones' wrongdoing based on an investigation that included interviews with 18 former and current Edward Jones brokers.

81.    According to the article, the pressure to sell the preferred funds made it financially foolhardy for Edward Jones brokers to sell non-preferred funds. Quoting brokers who had sold only the preferred funds for years, the article reported as follows:

> Individual brokers have a strong financial incentive to pitch favored funds. The revenue-sharing payments are credited as income to the profit-and-loss statements of brokerage branches. Those statements are a significant factor in determining the size of brokers' bonuses, generally awarded three times a year, according to former brokers. The bonuses can add up to $80,000 or $90,000 for a good producer, and often average about a third of total compensation.
>
> **"I sold no outside funds, says former broker Eddie Hatch, who worked at Jones in North Carolina for 13 years, until he left in**

25

**2000 to work for another brokerage firm. You took a reduced payout" if you sold funds not on the preferred list, he adds.**

Jones floods its brokers with literature from its preferred funds, former brokers say. "I didn't take the blinders off for nine years," says Scott Maxwell of Cary, N.C., a broker who left Jones for another firm in March of last year. He switched jobs, he says, largely because he was uncomfortable with the limited fund selection. Mr. Maxwell says he wanted to be freer to offer clients funds with better investment performance and lower fees.

Jeff Davis says he was "young and wet behind the ears" when he was hired at Jones in 1993 after a stint as a White House intern. **Even before he fully understood the financial incentives, he says he sold the seven funds almost exclusively. "I was afraid not to,"** he adds. Mr. Davis, who left Jones in 2001 and started his own business, also says he was uncomfortable with the incentives and wanted more leeway to sell other funds.

[Emphasis added.]

82.     The revenue sharing arrangements were harmful to investors, who, consistent with Edward Jones' representations, believed they were receiving objective, independent advice. In this regard, the *Wall Street Journal* article quotes a disappointed Edward Jones client who invested in one of the preferred mutual funds as follows:

> Like many who bought poorly performing [...] mutual funds in recent years, Nancy Wessels lost big. [...] What the 80-year old widow's broker, Edward D. Jones & Co., never told her was that it had a strong incentive to sell [the "preferred"] funds instead of rivals that performed better. Jones receives hefty payments – one estimate tops $100 million a year – [from the "preferred" fund companies in exchange] for favoring those companies' funds at Jones's 8,131 U.S. sales offices, the largest brokerage network in the nation.
>
> **When training its brokers in fund sales, Jones gives them information almost exclusively about the seven "preferred" fund companies, according to former Jones brokers.** Bonuses for brokers depend in part on selling the preferred funds, and Jones generally discourages contact between brokers and sales representatives from rival funds. **But while revenue sharing and related incentives are familiar to industry insiders, Jones typically doesn't tell customers about any of these arrangements.**

26

> **The situation "gives you the feeling of being violated," says Mrs. Wessels's son, DuWayne, a Waterloo, Iowa, real-estate broker.** He says he found out about the fund-company payments to Jones from his mother's new broker when the son moved her $300,000 account to another firm in 2002.
>
> **"The deception is that the broker seems to give objective advice," says Tamar Frankel, a law professor at Boston University who specializes in mutual-fund regulation. "In fact, he is paid more for pushing only certain funds."**

[Emphasis added.]

83.     The *Wall Street Journal* similarly noted that Edward Jones brokers were steering customers to Goldman Sachs mutual funds, although Goldman Sachs stock funds "have been underperformers."

84.     On January 14, 2004, the *Wall Street Journal* published an article under the headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers." Citing "a person familiar with the investigation," the article notes that the SEC is "close to filing its first charges against mutual fund companies related to arrangements that direct trading commissions to brokerage firms that favor those fund companies' products." The article stated in pertinent part as follows:

> **The SEC has been probing the business arrangements between fund companies and brokerage firms since last spring.** It held a news conference yesterday to announce **it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements.**
>
> Officials said the agency has opened investigations into eight brokerage firms and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing." Agency officials said they expect that number to grow as its probe expands. They declined to name either the funds or the brokerage firms.
>
> The SEC said payments varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund.

27

*     *     *

> People familiar with the investigation say regulators are
> looking into examples of conflict of interest when fund
> companies use shareholder money to cover costs of sales
> agreements instead of paying the sales costs themselves out of
> the firm's own pockets. The boards of funds, too, could be
> subject to scrutiny for allowing shareholders' commission
> dollars to be used for these sales agreements. In other cases,
> the SEC is probing whether funds violated policies that would
> require costs associated with marketing a fund to be included
> in a fund's so-called 12b-1 plan.

[Emphasis added.]

## THE GOLDMAN SACHS DEFENDANTS
## ENGAGED IN IMPROPER CONDUCT

### The Trustee/Officer Defendants Breached Their
### Fiduciary Duties To Goldman Sachs Funds Investors

85.     Mutual funds Board of Directors/Trustees have a duty to protect investors and to closely watch that fees paid to an Investment Adviser are not excessive and that the Investment Adviser is acting in the best interests of the mutual fund investors. As explained by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual Funds Directors Forum:

> The board of directors of a mutual fund has significant responsibility to
> protect investors. By law, directors generally are responsible for the
> oversight of all of the operations of a mutual fund. In addition, under the
> Investment Company Act, directors are assigned key responsibilities, such
> as negotiating and evaluating the reasonableness of advisory and other
> fees, selecting the fund's independent accountants, valuing certain
> securities held by the fund, and managing certain operational conflicts.
>
> The role of fund directors is particularly critical in the mutual fund context
> because almost all funds are organized and operated by external money-
> management firms, thereby creating inherent conflicts of interest and
> potential for abuse. Money-management firms operating mutual funds
> want to maximize their profits through fees provided by the funds, but the
> fees, of course, paid to these firms, reduce the returns to fund investors.
>
> Independent directors, in particular, should serve as "independent
> watchdogs" guarding investors' interests — and helping to protect fund

28

assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit they must be operated.

*See* http://www.sec.gov/news/speech/spch010704whd.htm.

86.    The Investment Company Institute ("ICI"), of which Goldman Sachs & Co. is a member, also recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.
>
> **Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.**
>
> **In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.**

[Emphasis added.][1]

87.    Accordingly, Goldman Sachs Funds public filings state that the Trustees of Goldman Sachs Funds are responsible for the management and supervision of each respective fund. In this regard, the SAI states, with respect to the duties of board members, as follows:

---

[1]    The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members represent 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The quotation above is excerpted from a paper entitled a paper titled *Understanding the Role of Mutual Fund Directors* available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

> The business and affairs of the Funds are managed under the direction of the Board of Trustees subject to the laws of the State of Delaware and the Trust's Declaration of Trust. The Trustees are responsible for deciding matters of general policy and reviewing the actions of the Trust's service providers. The officers of the Trust conduct and supervise each Fund's daily business operations.

88. Another section of the SAI appears under the heading MANAGEMENT SERVICES and sets forth in greater detail the purported process by which the investment manager is selected:

> The Funds' Management Agreements were most recently approved by the Trustees, including a majority of the Trustees who are not parties to the Management Agreements or "interested persons" (as such term is defined in the Act) of any party thereto (the "non-interested Trustees"), on April 24, 2002…At those meetings the Board of Trustees reviewed the written and oral presentations provided by the Investment Adviser in connection with the Trustees' consideration of the Management Agreements…**The Trustees considered, in particular, the Funds' management fee rates; the Funds' respective operating expense ratios; the Investment Adviser's current and prospective fee waivers and expense reimbursements for the respective Funds; and the investment performance of the Funds for the prior year and longer time periods.** The information on these matters was also compared to similar information for other mutual funds. **In addition, the Trustees considered the Funds' management fee structures in comparison to the structures used by other mutual funds; the revenues received by the Investment Adviser and its affiliates from the Funds for their investment management services and for other, non-investment management services, and their expenses in providing such services; the brokerage and research services received in connection with the placement of brokerage transactions for the Funds; and the Funds' asset levels and possible economies of scale.** The Trustees also considered the personnel and resources of the Investment Adviser, the overall nature and quality of the Investment Adviser's services and the specific provisions of the Management Agreements. After consideration of the Investment Adviser's presentations, the non-interested Trustees discussed at greater length in executive session the fairness and reasonableness of the Management Agreements to the Funds and their shareholders, and concluded that the Management Agreements should be reapproved and continued in the interests of the Funds and their shareholders.

[Emphasis added.]

89.    In truth and in fact, however, the Goldman Sachs Registrants boards of trustees were captive to and controlled by Goldman Sachs who prevented Goldman Sachs Funds board members from fulfilling their statutory and fiduciary duties to manage and supervise the Goldman Sachs Funds, approve all significant agreements and otherwise take reasonable steps to prevent Goldman Sachs from skimming Goldman Sachs assets and charging excessive fees. The Defendants' Funds board members were beholden for their positions, not to Defendants' Fund investors, but rather to the Investment Adviser Defendants they were supposed to oversee. The Trustee Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings). In this regard, the SAI stated as follows:

> **The Trust is not required to hold annual meetings of shareholders and does not intend to hold such meetings.** In the event that a meeting of shareholders is held, each share of the Trust will be entitled, as determined by the Trustees without the vote or consent of the shareholders, either to one vote for each share or to one vote for each dollar of net asset value represented by such share on all matters presented to shareholders including the election of Trustees… **The Trustees will call a special meeting of shareholders for the purpose of electing Trustees** if, at any time, less than a majority of Trustees holding office at the time were elected by shareholders.

[Emphasis added.]

90.    To ensure that the trustees toed the line, the Investment Adviser Defendants often recruited key fund trustees from the ranks of investment adviser companies and paid them excessive salaries for their service as trustees. For example, Gary D. Black was a Managing Director of Goldman Sachs and a trustee in charge of overseeing all of the portfolios in the Goldman Sachs Fund Complex. James McNamara was a Managing Director of Goldman Sachs,

a Director of Institutional Fund Sales at GSAM, and a trustee in charge of overseeing all of the portfolios in the Goldman Sachs Fund Complex. Alan A. Shuch is an Advisory Director at GSAM, a Consultant to GSAM, a Limited Partner of Goldman Sachs and a trustee in charge of overseeing all of the portfolios in the Goldman Sachs Fund Complex. Kaysie P. Uniacke is a Managing Director of GSAM, President of the Goldman Sachs Mutual Fund Complex and a trustee in charge of overseeing all of the portfolios in the Goldman Sachs Fund Complex. All other trustees are responsible for management of the Funds and oversaw all the fund portfolios in the Fund complex, which ranged from 43 to 64 during the Class Period. It is highly unlikely that the trustees properly performed their monitoring and supervisory functions with respect to each of these portfolios as required by the Investment Company Act or even could have done so. It is common for other individuals to serve on the boards of different Registrants such that it is likewise impracticable for them to properly perform their supervisory and monitoring functions. Rather, the Registrants trustees functioned to falsely legitimize and validate the Investment Adviser Defendants' improper conduct.

91.    In exchange for creating and managing the Goldman Sachs Funds, Goldman Sachs charges investors a fee comprised of a percentage of each respective Fund's average daily net assets. Hence, the more money invested in the funds, the greater the fees paid to Goldman Sachs. In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the board's dependence on assets under management, and its failure to properly manage the investment adviser, a tremendous amount of fees were paid to assets under management for services that were of no benefit to fund investors.

32

92.     As a result of these practices, the mutual fund industry was enormously profitable *for Goldman Sachs*. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . **The [mutual fund] business grew 71-fold (20-fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%. . . .** [F]und vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: "Tens of thousands of independent directors, over more than six decades, have failed miserably." A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never.

[Emphasis added.]

93.     Due in large part to the conflicted boardroom culture created by Goldman Sachs' trustees, Plaintiffs and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which Goldman Sachs was using, *inter alia*, so-called investment adviser fees, 12b-1 fees, Soft Dollars (as defined below), and directed brokerage commissions to improperly siphon investor assets to assist in peddling its wares on unwitting investors.

### The Goldman Sachs Defendants' Improper Use of Revenue Sharing and Excessive Commissions

94.     The Investment Adviser Defendants used revenue sharing and paid excessive commissions to broker-dealers who steered their clients into Goldman Sachs Funds as part of a *quid pro quo* "shelf-space program" arrangement between Goldman Sachs and brokerages. Such payments were used to fund sales contests and other financial incentives to further push Goldman Sachs Funds. These incentives created a conflict of interest and caused brokers to steer clients to Goldman Sachs Funds regardless of the funds' investment quality relative to other

investment alternatives and to thereby breach their duties of loyalty. As described by the

National Association of Insurance and Financial Advisors:

> This practice creates numerous potential conflicts of interest,
> including possible incentives for broker-dealers to base their fund
> recommendations to customers on brokerage commission
> considerations rather than on whether a particular fund is the best
> match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

95.    By paying the excessive commissions and revenue sharing to participate in "shelf-space programs," the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan. Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other government regulators have made it clear that the use of excessive commissions and revenue sharing to participate in "shelf-space programs" -- as Goldman Sachs has done here -- are highly improper.

96.    The SEC has expressed serious concerns regarding the significant conflicts of interest inherent in revenue-sharing programs and has mandated that proper disclosure must be made. Specifically, the SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds. Even though revenue-sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities .... Moreover, revenue-sharing arrangements may prevent some advisers from reducing their current advisory fees." 69 Fed. Reg. 6438, 6411, n. 21 (February 10, 2004). The Morgan Stanley revenue sharing programs that the SEC declared

34

improper included both cash payments made ostensibly by the distributor or adviser, as well as payments through directed brokerage.

97.    The SEC has brought actions against other mutual fund companies for the same type of behavior complained about here. As stated in a recent Administrative Proceeding against MFS:

> **The SAIs did not adequately disclose to shareholders that MFS had entered into bilateral arrangements in which it agreed to allocate specific negotiated amounts of fund brokerage commissions, subject to best execution, to broker-dealers for "shelf space" or heightened visibility within their distribution systems.**

*See* The March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanctions Against MFS, File No. 3-22450, *at* http://www.sec.gov/litigation/admin/ia-2224.htm [Emphasis added.]

98.    Similarly, in the Administrative Proceeding against Morgan Stanley, the SEC explained:

> At issue in this matter are two distinct disclosure failures. The first relates to Morgan Stanley DW's operation of mutual fund **marketing programs in which it collected from a select group of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments. These programs were designed to specially promote the sale of those mutual funds with enhanced compensation to individual registered representatives, known as financial advisors ("FAs"), and branch managers as well as increased visibility in its extensive retail distribution network.**

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/33-8339.htm [Emphasis added.]

99.    On September 15, 2004, PIMCO entities entered into a settlement with the SEC. Similar to the allegations in this complaint against Goldman Sachs, the SEC charged PIMCO entities with failing to disclose payments for shelf-space at brokerage firms. The Press release stated:

35

The Securities and Exchange Commission announced today a settled enforcement action against the investment adviser, sub-adviser, and principal underwriter and distributor for the PIMCO Funds Multi-Manager Series funds (the PIMCO MMS Funds). The suit charges the entities with **failing to disclose to the PIMCO MMS Funds' Board of Trustees and shareholders material facts and conflicts of interest that arose from their use of directed brokerage on the PIMCO MMS Funds' portfolio transactions to pay for "shelf-space" arrangements with selected broker-dealers.**

*       *       *

Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated, "An investment adviser's undisclosed use of mutual fund assets to defray the adviser's, or an affiliated distributor's, own marketing expenses is a breach of the adviser's duty. Our action today — like the action brought by the Commission against Massachusetts Financial Services Company some six months ago — demonstrates the Commission's resolve to ensure that mutual fund shareholders know how their money is being spent."

*See* http://www.sec.gov/news/press/2004-130.htm. [Emphasis added.]

100.    On December 13, 2004, the SEC announced a settlement of charges against Franklin Advisers, Inc. and Franklin Templeton Distributors (collectively "Franklin") "alleging that Franklin, without proper disclosure, used fund assets to compensate brokerage firms for recommending the Franklin Templeton mutual funds over others to their clients." The SEC press release continued:

This practice is known as compensating brokerage firms for "shelf space." As part of the settlement, Franklin agreed to pay $1 million in disgorgement and a $20 million penalty as well as undergo certain compliance reforms.

*       *       *

The use of brokerage commissions to compensate brokerage firms for marketing created a conflict of interest between FA and the funds because FA benefited from the increased management fees resulting from increased fund sales. Mutual funds that follow this practice of using brokerage commissions for marketing have an incentive to do their fund portfolio trading through brokerage firms that might not be the best choice for fund shareholders. FA was

36

required, but failed, to disclose adequately the arrangements to the boards so they could approve this use of fund assets, and to shareholders so they could be informed when making investment decisions.

*See* http://www.sec.gov/news/press/2004-168.htm.

101. On December 22, 2004, the SEC, NASD, and NYSE announced settled enforcement proceedings against Edward Jones "related to allegations that Edward Jones filed to adequately disclose revenue-sharing payments that it received from a select group of mutual fund families that Edward Jones recommended to its customers." As part of the settlement, Edward Jones paid $75 million in disgorgement and civil penalties. The press release continued:

> Linda Chatman Thomsen, Deputy Director of the Commission's Division of Enforcement, said "Edward Jones' undisclosed receipt of revenue sharing payments from a select group of mutual fund families created a conflict of interest. When customers purchase mutual funds, they should be told about the full nature and extent of any conflict of interest that may affect the transaction. Edward Jones failed to do that."

> *            *            *

> In NASD's separate settlement, in addition to the receipt of direct revenue sharing payments, NASD found that the firm gave preferential treatment to the Preferred Funds in exchange for millions of dollars in directed brokerage from three of the Preferred Fund families. This violates NASD's 'Anti-Reciprocal Rule," Conduct Rule 2830(k), which prohibits regulated firms from favoring the distribution of shares of particular mutual funds on the basis of brokerage commission to be paid by the fund companies.

*See* http://www.sec.gov/news/press/2004-177.htm.

102. Further illustrating that the NASD views revenue-sharing programs as improper and impermissible, a February 16, 2005 press release regarding the NASD's filing of a complaint against American Funds Distributors states:

> American Funds Distributors, Inc. violat[ed] NASD's Anti-Reciprocal Rule by directing approximately $100 million in

37

> brokerage commissions over a three-year period to about 50 brokerage firms that were the top sellers of American Funds.
>
> *       *       *
>
> The commissions were payments for executing trades for the American Funds' portfolio that were directed to the brokerage firms as additional compensation for past sales of American Funds, and to ensure that American Funds would continue to receive preferential treatment at those firms.
>
> *       *       *
>
> "Prior cases in this area have focused on retail firms that received directed brokerage payments from mutual fund companies in exchange for giving preferential treatment to their funds," said NASD Vice Chairman Mary L. Schapiro. ***Today's action makes clear that it is just as impermissible to offer and makes such payments as it is to receive them.***"

(emphasis added).

103.    The excessive commissions and revenue sharing payments used by Defendants, and considered improper by the SEC as noted above, did not fund any services that benefited the Goldman Sachs Funds' shareholders. These practices materially harmed plaintiffs and other members of the class from whom the illegitimate and improper fees were taken.

**The Investment Adviser Defendants Used
<u>Rule 12b-1 Marketing Fees For Improper Purposes</u>**

104.    By paying the excessive brokerage commissions and directed brokerage, Goldman Sachs additionally violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.

105.    Section 12(b) of the Investment Company Act prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, are met. The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of