USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/17/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

IN RE GOLDMAN SACHS MUTUAL FUNDS          **MEMORANDUM AND ORDER**
FEE LITIGATION
                                          04 Civ. 2567 (NRB)
-------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Lois Burke, Marianne Gooris, Henry C. Gross, Josef and Diana Pokorny and Maurice and Arlene Rosenthal (collectively, "plaintiffs"), each of whom is a current and/or former shareholder in various Goldman Sachs mutual funds ("Goldman Sachs Funds" or "Funds")[1], have brought this purported class action on behalf of a class consisting of all persons or entities who held one or more shares of Goldman Sachs Funds during the period April 2, 1999 to January 9, 2004 (the "Class

---

[1] The specific funds identified in Exhibit A of the complaint, and collectively referred to herein as the "Goldman Sachs Funds" or "Funds," are as follows:  Goldman Sachs ("GS") Balanced Fund, GS Concentrated Growth Fund, GS Small Cap Value Fund, GS Mid Cap Value Fund, GS Growth Opportunities Fund, GS Strategic Growth Fund, GS Capital Growth Fund, GS Research Growth Fund, GS Large Cap Value Fund, GS Growth and Income Fund, GS Core Small Cap Equity Fund, GS Core Large Cap Growth Fund, GS Large Cap Value Fund, GS Core U.S. Equity Fund, GS Asia Growth Fund, GS Emerging Markets Equity Fund, GS International Growth Opportunities Fund, GS Japanese Equity Fund, GS European Equity Fund, GS International Equity Fund, GS Core International Equity Fund, GS Balanced Strategy Portfolio, GS Growth and Income Strategy Portfolio, GS Growth Strategy Portfolio, GS Aggressive Growth Strategy Portfolio, GS High Yield Fund, GS High Yield Municipal Fund, GS Global Income Fund, GS Core Fixed Income Fund, GS Municipal Income Fund, GS Government Income Fund, GS Short Duration Tax-Free Fund, GS Short Duration Government Fund, GS Ultra-Short Duration Government Fund, GS Enhanced Income Fund, GS Internet Tollkeeper Fund, GS Core Tax-Management Equity Fund, GS Real Estate Securities Fund, GS ILA Prime Obligations Portfolio, GS ILA Tax-Exempt Diversified Portfolio, and GS Research Select Fund.

Period").    Plaintiffs also bring a derivative claim against the Goldman Sachs Funds' investment advisers on behalf of the Funds.

Plaintiffs bring these claims against:    the nominal defendants, the Goldman Sachs Funds; the Funds' investment advisers, Goldman Sachs Asset Management, L.P. ("GSAM") and Goldman Sachs Asset Management International ("GSAMI") (collectively, "Investment Adviser defendants"); the trustees and officers of the Goldman Sachs Funds (collectively, "Trustee/Officer defendants")[2]; the distributor of the Funds, Goldman, Sachs & Co. (the "Distributor"); as well as the parent company, The Goldman Sachs Group, Inc. ("Goldman Sachs") (collectively, "defendants").[3]

Plaintiffs allege that defendants violated the Investment Company Act ("ICA") (Counts I-IV) and the Investment Advisers Act (Count V), breached their fiduciary duties under state law (Counts VI-VII), and were unjustly enriched (Count VIII). Defendants now move to dismiss all of plaintiffs' claims.    For

---

[2] The specific trustees and officers named in the complaint, and collectively referred to herein as the "Trustee/Officer defendants," are as follows:    James McNamara, Alan A. Shuch, Kaysie P. Uniacke, John M. Perlowski, Philip V. Giuca, Jr., Peter Fortner, Kenneth G. Curran, James A. Fitzpatrick, Jesse Cole, Kerry K. Daniels, Mary F. Hoppa, Christopher Keller, Howard B. Surloff, Dave Fishman, Danny Burke, Elizabeth D. Anderson, Amy E. Curran, Ashok N. Bakhru, Patrick T. Harker, Mary P. McPherson, Wilma J. Smelcer, Richard P. Strubel, and Gary D. Black.

[3] Plaintiffs also name defendants John Does 1-100, who are other wrongdoers whose identities have yet to be ascertained.

2

the reasons set forth herein, defendants' motion is granted in its entirety.

## BACKGROUND[4]

### I. The Parties

#### A. The Plaintiffs

Plaintiffs Lois Burke, Marianne Gooris, Henry C. Gross, Josef and Diana Pokorny, and Maurice and Arlene Rosenthal each allege that they held shares of one of the Funds during the Class Period. SAC at ¶¶ 15-19. Five of these seven named plaintiffs continue to hold shares in at least one of the Funds. Id. at ¶¶ 15, 18, 19.

#### B. The Defendants

##### 1. The Funds

The Goldman Sachs Funds, named as nominal defendants, are open-ended management companies consisting of the capital invested by mutual fund shareholders. Id. at ¶ 50. During the Class Period, the number of Funds ranged from 43 to 64. Id. at ¶ 90. Each Fund is a series of the Goldman Sachs Trust or the Goldman Sachs Variable Insurance Trust (the "Trusts"), both of which are also open-end investment companies formed under the

---

[4] The following facts are drawn from plaintiffs' complaint and, as is appropriate on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), are assumed herein to be true. Where appropriate, facts are also drawn from documents referenced in plaintiffs' complaint. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

laws of the State of Delaware.  Id. at ¶ 51.  The Trusts share a common Board of Trustees.  Id. at ¶¶ 50, 51, 52.

### 2. Trustee/Officer defendants

The business and affairs of the Funds are governed by a Board of Trustees, which is responsible for deciding matters of general policy and reviewing actions of the Trusts' service providers.  Officers conduct and supervise each Fund's daily business operations.  Klapper Decl. Ex. 2 at B-49.  Sixteen current or former Goldman Sachs employees who are or were officers of the Trusts (including two who are also trustees) during the Class Period have also been named as defendants.

### 3. The Distributor

Defendant Goldman, Sachs & Co. is the exclusive distributor of shares of the Funds under a "best efforts" arrangement as provided by a distribution agreement with the Trusts on behalf of each Fund.  SAC at ¶ 49; Klapper Decl. Ex. 2 at B-65.  The Distributor is authorized to enter into sales agreements with certain dealers and other financial service firms ("Authorized Dealers") to solicit subscriptions for shares of the Funds. Klapper Decl. Ex. 2 at B-65.

### 4. The Investment Adviser Defendants

Defendant GSAM serves as investment adviser to the Funds and is itself a business unit of the Investment Management Division of Goldman Sachs.  SAC at ¶ 21.  Similarly, defendant

4

GSAMI is a unit of the Investment Management Division and serves as investment adviser to certain of the Funds. Id. at ¶ 22. The Investment Adviser defendants provide day-to-day advice regarding the Funds' portfolio transactions and are paid fees calculated as a percentage of the Funds' assets under management. Id. at ¶ 23. The Investment Adviser defendants are also responsible for selecting brokers to effect the Funds' transactions and are generally required to give primary consideration to obtaining the most favorable execution and net price available. Klapper Decl. Ex. 2 at B-72. The Funds may pay a broker an amount of disclosed commission in excess of the commission which another broker would have charged for effecting that transaction. Id. This practice is subject to a good faith determination about the reasonableness of the commission. Id.

### 5. The Parent Company

Defendant Goldman Sachs is a "leading global investment banking, securities and investment management firm that provides a wide range of services worldwide to a substantial and diversified client base." SAC at ¶ 20. It sponsors, markets, and provides investment-related services to various investment products, including mutual funds. It is one of the largest mutual fund managers in the United States, with $375 billion in assets under management as of December 31, 2003. Id.

5

## II. Plaintiffs' Complaint

On April 18, 2005, plaintiffs filed the Second Amended Consolidated Class Action Complaint ("SAC" or "complaint"). The gravamen of the complaint is that defendants charged the Funds' shareholders excessive fees, which were then used to pay "kickbacks" to brokerage firms to steer new investors into the Funds.[5] The Investment Adviser defendants, who were compensated based on a percentage of the assets under management, thereby benefited from the resulting increase in the Funds' assets. Plaintiffs allege that while this practice may have enriched defendants by bringing in more shareholders (and consequently, more assets under management), it provided no benefit to the Funds' existing shareholders, who were charged excessive fees but received no benefits from the economies of scale that theoretically should have resulted from increasing assets.

Specifically, plaintiffs claim that pursuant to a practice referred to as buying "shelf-space," defendants used a portion of fees received from the Funds' shareholders to induce brokerage firms to steer yet more investors into the Funds. According to plaintiffs, this practice created a conflict of interest for the Investment Adviser defendants, who on the one

---

[5] Specifically, plaintiffs allege that defendants "made undisclosed and improper payments to brokerages including Edward D. Jones & Co. ('Edward Jones'), Salomon Smith Barney, Merrill Lynch and Wachovia Securities to induce them to direct investors into Goldman Sachs Funds." SAC at ¶ 2.

6

hand had a duty to act in the best interests of the Funds' investors, but on the other hand, stood to benefit from siphoning fees from shareholders to induce brokers to increase investments in the Funds. Plaintiffs allege that defendant Goldman Sachs was similarly motivated to induce brokers to steer investors into the Funds because the fees it collected for managing and advising the Funds (which were calculated as a percentage of the value of the Funds) presumably increased as the number of investors increased.

The Investment Adviser defendants justified this practice by reasoning that increasing the assets of the Funds would create economies of scale that would in turn benefit investors. However, plaintiffs allege that in reality investors received no such benefits. Rather, according to the complaint, fees and costs associated with the Funds increased during the Class Period, due largely to the Investment Adviser defendants' practice of "skim[ming]" from the Funds to finance its "marketing campaign." Id. at ¶ 4. The Trustee/Officer defendants, though purporting to be the "investor watchdogs" of the Funds, knowingly or recklessly permitted such conduct. Id. Further, the complaint alleges that the defendants purposely omitted disclosing the nature of these fees and commissions because they knew that the conflicts of interest created by the

7

incentives would be significant to any reasonable investor. Id. at ¶ 5.

Plaintiffs cite figures in support of their assertions that the defendants' actions resulted in concrete harm to the Funds. Specifically, plaintiffs allege that while net assets for the Funds increased from $92.2M to $146.8M during the Class Period, the net asset value ("NAV") per share dropped from $12.52 on August 31, 1999 to $7.79 on August 31, 2003. Id. at ¶ 109. Over the same period, the ratio of net expenses to average net assets increased from 1.44% to 1.45%. Id.

As further support for their allegations of wrongdoing, plaintiffs point to several external events. Specifically, the complaint references findings made by the United States Securities and Exchange Commission ("SEC") in other cases that practices similar to those at issue here pose conflicts of interest in violation of securities laws. Id. at ¶ 6. In addition, plaintiffs allege that the National Association of Securities Dealers, Inc. (the "NASD") condemned the practices at issue in this case after concluding that such payments to brokerages violated NASD Rule 2830(k). Id. at ¶ 8. Finally, plaintiffs reference a January 29, 2004 article in the Wall Street Journal which "exposed" defendants' shelf-space program. Id. at ¶ 9.

As earlier noted, the complaint contains eight counts. Count One is asserted against the Investment Adviser and Trustee/Officer defendants and alleges violations of Section 34(b) of the Investment Company Act ("ICA") for failure to disclose necessary information and for making materially false and misleading statements. Plaintiffs, it is alleged, relied on these statements and thus continued to hold their shares in the Funds, thereby sustaining injury due to the impact of the disputed charges on the value of their holdings. Count Two alleges that the Investment Adviser, Trustee/Officer, and Distributor defendants breached their fiduciary duties under Section 36(a) of the ICA by improperly charging investors purported Rule 12b-1, 17 C.F.R. § 270.12b-1 (2004) ("Rule 12b-1"), marketing fees and drawing on assets of the Funds' investors to make payments of "soft dollars" and excessive commissions. Count Three alleges that the Investment Adviser, Trustee/Officer, and Distributor defendants breached their fiduciary duties under Section 36(b) of the ICA by charging excessive advisory and purported Rule 12b-1 marketing fees. Count Four alleges that Goldman Sachs is liable as the "control person" of the Investment Adviser and Trustee/Officer defendants under Section 48(a) of the ICA. Count Five (which is brought derivatively on behalf of the Funds) alleges that the Investment Adviser defendants breached their fiduciary duties to the Funds

9

under Section 215 of the Investment Advisers Act (IAA), 15 U.S.C. § 80b-15, by knowingly and/or recklessly engaging in acts, transactions, practices, and courses of business which operated as a fraud upon the Funds.  Plaintiffs seek to rescind the investment advisory agreements between the Funds and the Investment Adviser defendants and recover all fees paid pursuant to those agreements.

Counts Six through Eight assert various state law claims. Count Six asserts that the Investment Adviser defendants breached their fiduciary duties to the plaintiffs and the purported class by failing to manage the companies entrusted to their care in the best interests of the plaintiffs and the purported class and causing them to bear unnecessary costs by allowing the wrongful payment of excessive fees and commissions. Count Seven asserts that the Trustee/Officer defendants breached their fiduciary duty to plaintiffs and the purported class by failing to supervise and monitor the Investment Adviser defendants for their benefit and allowing the wrongful payment of excessive fees and commissions.  Count Eight alleges unjust enrichment against all defendants.

Defendants have moved to dismiss the complaint in its entirety.  For the reasons set forth below, defendants' motion is granted.

10

## DISCUSSION

In considering a motion to dismiss, the Court must accept as true all material factual allegations in the complaint. Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001). However, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (quoting Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000)). A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

### I. Private Rights of Action (Counts One and Two)

Defendants move to dismiss Counts One and Two on the ground that no private rights of action exist under Sections 34(b)[6] and

---

[6] Section 34(b) states in relevant part:

> It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter . . . . It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

11

36(a)[7] of the ICA.   Other courts in this district have recently addressed this very issue.   Judge Koeltl, in a decision addressing allegations nearly identical to those made in this complaint, held that "[t]he absence of rights-creating language, the existence of an alternative method of enforcement, and the existence of an explicit private right of action for another provision of the statute creates the strong presumption that Congress did not intend to create private rights of action under §§ 34(b), 36(a), or 48(a)."[8]   In re Eaton Vance Mut. Funds Fee

---

15 U.S.C. § 80a-33(b).

[7] Section 36(a) states in relevant part:

> The Commission is authorized to bring an action in the proper district court of the United States . . ., alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts--(1) as officer, director, member of any advisory board, investment adviser, or depositor; or (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

15 U.S.C. § 80a-35(a).

[8] Though defendants make this argument in regard to Section 48(a) only in cursory fashion in their Reply brief, we see no reason why the arguments in support of a lack of a private right of action under Sections 34(b) and 36(a) should not also apply to Section 48(a). Therefore, this rationale provides an additional reason for dismissal of Count Four.

12

Litig., 380 F. Supp. 2d 222, 232 (S.D.N.Y. 2005).[9]   Judge Cederbaum, also addressing substantially similar allegations, subsequently adopted Judge Koeltl's reasoning and agreed that no private right of action exists under either statute.  See In re Davis Selected Mut. Funds Litig., No. 04 Civ. 4186 (MGC), 2005 WL 2509732, at *2 (Oct. 11, 2005).

Although the Court of Appeals has not yet specifically decided whether there are private rights of action under Sections 34(b) and 36(a), we agree that the logic of the Court's holding in Olmsted v. Pruco Life Ins. Co. of New Jersey, 283 F.3d 429 (2d Cir. 2002), applies equally to these sections.  See Eaton Vance, 380 F. Supp. 2d at 232; Davis, 2005 WL 2509732, at *2; see also In re Merrill Lynch & Co. Research Reports Sec. Litig. Relating to Global Tech. Fund, 272 F. Supp. 2d 243, 257 (S.D.N.Y. 2003) (applying Olmsted analysis and concluding that no private right of action exists under Section 34(b)). Accordingly, defendants' motion to dismiss Counts One and Two is granted.[10]

---

[9] Judge Koeltl subsequently granted reconsideration and upon reconsideration, adhered to his prior decision.  See In re Eaton Vance Mut. Funds Fee Litig., 04 Civ. 1144 (JGK), 2005 WL 3299759 (S.D.N.Y. Dec. 6, 2005).

[10] Contrary to plaintiffs' argument, the Supreme Court's recent decision in Jackson v. Birmingham Bd. of Educ., 125 S. Ct. 1497 (2005), does not compel a different conclusion.  There, the Court explicitly stated that its decision was "[i]n step with Sandoval" and looked to the text of the statute in its analysis.  Jackson, 125 S. Ct. at 1507.  Nor are we persuaded to reach a different conclusion by

## II. Derivative Claims (Counts One, Two, Six, Seven and Eight)

Defendants move to dismiss Counts Six, Seven, and Eight on the ground that the claims should have been brought by, or derivatively on behalf of, the Funds. Defendants also assert that this argument provides another basis for dismissing Counts One and Two. Under Delaware law,[11] the following questions determine whether a claim should be brought derivatively: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).

In order to state a direct claim, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." Id. at 1039. "[W]here the substantive nature of the alleged injury is such that it falls directly on the corporation as a whole and

---

the other cases cited by plaintiffs, which pre-dated Olmsted and merely assumed that a private right of action existed under Section 36(a). See Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002); Fogel v. Chestnutt, 668 F.2d 100 (2d Cir. 1981).

[11] Because the Funds are series of the Trusts, which were formed under Delaware law, that state's law governs the issue of whether a claim should be brought derivatively. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98 (1991).

collectively, but only secondarily, upon its stockholders as a function of and in proportion to their pro rata investment in the corporation, the claim is derivative in nature and may be maintained only on behalf of the corporation." In re Triarc Cos., 791 A.2d 872, 878 (Del. Ch. 2001) (citation omitted). Consistent with this reasoning, claims for mismanagement of corporate assets generally have been held to be derivative in nature. See, e.g., Tooley, 845 A.2d at 1038; Weinstein v. Applebaum, 193 F. Supp. 2d 774, 782 (S.D.N.Y. 2002) ("While harm to shareholders may indeed flow from mismanagement, Delaware law provides that the corporation alone has a cause of action."); Metro Commc'n Corp. BVI v. Advanced Mobilecomm Tecs. Inc., 854 A.2d 121, 167-68 (Del. Ch. 2004).

Applying Delaware law, we find that Counts One, Two, Six, Seven, and Eight should have been brought as derivative claims.[12] These claims essentially allege that defendants failed to disclose information to investors and mismanaged the Funds in part by using fees and assets to make improper payments. In short, these are claims of mismanagement of assets by defendants which fail to allege any injury independent of the alleged injury to the Funds.

---

[12] While we already concluded in our preceding discussion that Counts One and Two should be dismissed because there are no private rights of action under Sections 34(b) and 36(a) of the ICA, our reasoning in this section provides another ground for dismissal of these counts.

Plaintiffs argue that they have successfully alleged a direct injury in this case which entitles them to bring a direct action. Specifically, plaintiffs argue that whereas with traditional corporations an increase in corporate expenses would not necessarily impact the market price for shares, any increase in a mutual fund's fees and expenses automatically affects the price at which a shareholder can legally sell his shares.[13] In short, plaintiffs argue that any increased fees and expenses are borne directly by shareholders of the Funds because of their ownership of Fund assets.[14]

In support of this argument, plaintiffs cite Strigliabotti v. Franklin Resources, Inc., No. C 04-00883 SI, 2005 WL 645529, at *8 (N.D. Cal. Mar. 7, 2005) (finding that where claim was for excessive advisory and 12b-1 fees, plaintiffs alleged individual injury rather than injury to mutual fund). In Strigliabotti, the court noted that "[e]very dollar of expense borne by the fund is distributed to shareholders, as a pro rata deduction

_____

[13] As plaintiffs explain, "[t]he value of an investor's mutual fund is determined by subtracting a fund's liabilities from its assets to arrive at the fund's Net Asset Value ('NAV'). The excessive fees and charges about which Plaintiffs complain immediately reduced the Funds' NAV per share, decreasing the amount at which each shareholder is entitled to redeem his or her shares." Opp. Mem. at 18.

[14] Defendants state that investment advisory and Rule 12b-1 fees are paid out of the assets of the Funds rather than from individual shareholder accounts. Reply Br. at 11. Though plaintiffs at one point seemed to suggest that the fees and expenses in question are drawn directly from shareholders' accounts, Pl. Opp. Mem. at 19, during oral argument they essentially confirmed defendants' version of the source of the fees.

16

from the net asset value per share.  Fees, likewise, are paid by individual investors."   Id. at *7.   Therefore, the court concluded, "plaintiffs do not allege injury to the Funds themselves, but rather individual injury.  Indeed, the financial harm from overcharges is harm to the individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis."   Id. at *8.   We are not persuaded that this holding, which applied a similar (though not identical) standard for derivative suits under California law, is consistent with Delaware law.

Rather, a pro rata bearing of expenses by individual shareholders seems to fall within the very essence of an injury which is not independent from that suffered by the corporation. See Triarc, 791 A.2d at 878; Hogan v. Baker, No. Civ. A. 305CV0073P, 2005 WL 1949476, at *4 (N.D. Tex. Aug. 12, 2005) (rejecting Strigliabotti and holding claim was derivative under Delaware law where plaintiffs were injured "indirectly as a result of their investment in the Funds").  Indeed, "if the only injury to an investor is the indirect harm which consists of the diminution in the value of his or her shares, the suit must be derivative."  Hogan, 200 WL 1949476, at *4 (citations omitted).

Thus, even if we accept plaintiffs' arguments regarding the costs to shareholders, such an injury was not independent of any injury suffered by the Funds.  Rather, the alleged injury to

17

plaintiffs occurred only secondarily and "as a function of and in proportion to their pro rata investment" in the Funds. In re Triarc Cos., 791 A.2d at 878 (citation omitted).[15]

Plaintiffs make the additional argument that the Funds actually benefited from the conduct at issue due to an increase in aggregate net asset value. Opp. Mem. at 17. Therefore, they argue, it would be impossible to make a derivative claim under these circumstances, and a direct claim would be consistent with the standard articulated in Tooley. However, regardless of whether or not plaintiff's assertion that the Funds benefited in some way were true, ultimately, the injury alleged – the bearing of improper costs – is one borne by the corporation. Thus, plaintiffs still would be unable to allege an independent injury.[16]

_____

[15] This reasoning applies even to Count One (where plaintiffs allege harm caused by their decisions to hold their shares of the Funds in reliance on misleading statements) because the alleged harm was caused by "the continuing impact of the charges on the value of their holdings," which, as discussed above, is an injury shared by the Funds.

[16] Plaintiffs rely in part on Bassini, 282 F.3d at 172 (holding under Maryland law that shareholders suffering an injury not derived from corporate injury could still bring direct suit even if injury was undifferentiated among them). That holding, however, is not inconsistent with the result reached here. There, the court noted that excess advisory fees would not support a direct claim. In addition, in that case plaintiffs alleged an injury which was not suffered by the corporation at all. See id. at 174-75. Here, however, plaintiffs allege an injury (excess fees) which was actually incurred by the Funds, thus rendering plaintiffs' injuries dependent upon those suffered by the Funds. We also disagree with the conclusion reached in In re Lord Abbett Mutual Funds Fee Litig., 385 F. Supp. 2d 471, 482 (D.N.J. 2005) (holding under Delaware and

Finally, plaintiffs argue that they may bring a direct action here because they seek to vindicate duties owed to them directly. Even if this were the case, a direct action would not be appropriate because plaintiffs cannot allege any injury independent from that suffered by the Funds. See Syncor, 857 A.2d at 997 ("The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." (emphasis added)). As the Supreme Court of Delaware has made clear, the analysis of whether a claim should be brought derivatively or directly turns solely on who suffered the harm alleged and who would receive the benefit of a recovery. See Tooley, 845 A.2d at 1033.[17] Therefore, defendants' motion to dismiss Counts Six,

---

Maryland law that decline in net asset value per share accompanied by net increase in Fund assets is not a derivative injury). Plaintiffs do not allege that defendants engaged in any practice which caused new shares to be sold at anything less than the net asset value per share. Therefore, any resulting decrease in NAV per share would have been caused by factors which, for reasons discussed above, were borne by the Funds as a whole.

[17] Plaintiffs cite no Delaware cases which reject this test. Plaintiffs cite Grimes v. Donald, 673 A.2d 1207 (Del. 1996), which held that "due care, waste and excessive compensation claims asserted here [were] derivative" while the abdication claim was direct. In explaining this decision, however, the court noted that "[t]he plaintiff must state a claim for an injury which is separate and distinct from that suffered by other shareholders, ... or a wrong involving a contractual right of a shareholder ... which exists independently of any right of the corporation." Id. (quotations and citation omitted).
    Furthermore, plaintiffs' contention that their claims necessarily are direct specifically because defendants' actions both breached their common law fiduciary duties to plaintiffs and constituted disclosure violations has been rejected by Delaware courts. See,

19

Seven and Eight is granted.[18]    In addition, the preceding
discussion provides additional grounds for dismissal of Counts
One and Two.

### III. Failure to State a Claim Under Section 36(b) (Count Three)

Defendants move to dismiss Count Three on the ground that
plaintiffs fail to state a claim under Section 36(b)[19] of the
ICA.  Specifically, defendants argue that plaintiffs have failed
to allege that the Trustee/Officer defendants actually received
investment advisory or Rule 12b-1 fees (which defendants assert

---

e.g., FS Parallel Fund L.P. v. Ergen, Civ. A. No. 19853, 2004 WL
3048751, at *3 (Del. Ch. Nov. 3, 2004) (applying Tooley and finding
breach of fiduciary duty claims were derivative); In re Syncor Int'l
Corp. S'holder Litig., 857 A.2d 994, 995 (Del. Ch. 2004) (same); see
also In re J.P. Morgan Chase & Co. S'holder Litig., No. Civ. A. 531-N,
2005 WL 1076069, at *12 (Del. Ch. Apr. 29, 2005) (finding that any
damages from disclosure claims belong to the corporation and can only
be pursued by the corporation).

[18] Defendants move to dismiss Counts Six, Seven and Eight on the
additional grounds that these claims are preempted by the Securities
Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-
353, 112 Stat. 3227 (codified as amended at 15 U.S.C. §§ 77p, 78bb).
Defendants also move to dismiss Count Eight as to the Trustee/Officer
defendants based on failure to state a claim of unjust enrichment.
Because we have already dismissed Counts Six, Seven and Eight based on
plaintiffs' failure to bring these state law claims as derivative
actions, we do not consider these arguments.

[19] Section 36(b) states in relevant part:
> [T]he investment adviser of a registered
> investment company shall be deemed to have a
> fiduciary duty with respect to the receipt of
> compensation for services, or of payments of a
> material nature, paid by such registered
> investment company, or by the security holders
> thereof, to such investment adviser or any
> affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).

is required under the statute) and that plaintiffs have not alleged facts demonstrating the lack of any reasonable relationship between fees received and services provided by the Distributor and Investment Adviser defendants.

### A. Receipt of Fees:    Trustee/Officer Defendants

Under Section 36(b), plaintiffs "shall have the burden of proving a breach of fiduciary duty" by the recipient of excessive compensation or payments.    15 U.S.C. § 80a-35(b)(1). Furthermore, "[n]o such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments."    15 U.S.C. § 80a-35(b)(3).

Plaintiffs do not dispute that they have not alleged that the Trustee/Officer defendants actually received the excessive fees at issue.    Rather, plaintiffs argue that the language of Section 36(b)(3) – in particular, "such compensation or payments" – encompasses not only disputed fees but also excessive compensation.[20]    Specifically, plaintiffs allege that the Trustee/Officer defendants "received improper payments, in

---

[20] The only support plaintiffs offer in support of this assertion is Meyer v. Oppenheimer Mgmt. Corp., 895 F. 2d 861, 866 (2d Cir. 1990).  We are hard pressed to understand how this case lends any credence to plaintiffs' argument that Section 36(b) applies also to claims for excessive trustee compensation, given that it involved the receipt of excessive advisory and Rule 12b-1 fees.

21

that they received their compensation despite the fact [sic] they violated their fiduciary duties." SAC at ¶ 176.

This allegation does not meet the requirements of Section 36(b)(3) because the Trustee/Officer defendants' compensation does not constitute receipt of payments for advisory services or Rule 12b-1 fees. See Levy v. Alliance Capital Mgmt. L.P., No. 97 Civ. 4672 (DC), 1998 WL 744005, at *3 (S.D.N.Y. Oct. 26, 1998) (finding no liability under Section 36(b) absent allegation that defendants "were recipients of compensation or payments for investment advisory services"); Jerozal v. Cash Reserve Mgmt., Inc., No. 81 Civ. 1569, 1982 WL 1363, at *6 (S.D.N.Y. Aug. 10, 1982) (finding that liability under Section 36(b) is limited to compensation or payments for investment advisory services and holding that suit against individual directors for breach of fiduciary duty regarding compensation or payments made to them was therefore not permitted); see also Eaton Vance, 380 F. Supp. 2d at 238 (finding that Section 36(b) excludes claims brought against investment advisors for breaches of fiduciary duty that only indirectly resulted in higher fees for advisers). Therefore, we dismiss Count Three against the Trustee/Officer defendants.

22

**B. Excessive Fees:  Distributor and Investment Advisor
Defendants**

Allegations that both advisory and Rule 12b-1 fees were
excessive are properly brought under Section 36(b).    See
Pfeiffer v. Bjurman, Barry & Assocs., No. 03 Civ. 9741 (DLC),
2004 WL 1903075, at *4 n.8 (S.D.N.Y. Aug. 26, 2004) ("Congress
enacted Section 36(b) in large part because it recognized that
as mutual funds grew larger, it became less expensive for
investment advisers to provide additional services. Congress
wanted to ensure that investment advisers passed on to fund
investors the savings that they realized from these economies of
scale.") (citations and quotations omitted).  "To be guilty of a
violation of § 36(b) . . . the adviser-manager must charge a fee
that is so disproportionately large that it bears no reasonable
relationship to the services rendered and could not have been
the product of arm's-length bargaining."  Gartenberg v. Merrill
Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982); see
also Meyer v. Oppenheimer Mgmt., Corp., 895 F.2d 861, 866 (2d
Cir. 1990).   In making this determination, courts consider all
relevant facts, including:

> (1) the nature and quality of the services
> provided   by   the   advisers   to   the
> shareholders; (2) the profitability of the
> mutual  fund  to  the  adviser-manager;  (3)
> 'fall-out'  benefits;  (4)  the  economies  of
> scale   achieved   by   the   mutual   fund   and
> whether such savings were passed on to the
> shareholders; (5) comparative fee structures

23

> with other similar funds; and (6) the independence and conscientiousness of the mutual fund's outside trustees.

Eaton Vance, 380 F. Supp. 2d at 237 (citations omitted); see also Gartenberg, 694 F.2d at 929-30; Levy v. Alliance Capital Mgmt. L.P., No. 97 Civ. 4672 (DC), 1998 WL 744005, at *2 (S.D.N.Y., Oct. 26, 1998).

However, the pleading standards at this stage do not require us to assess whether all six factors have been met. See Strougo v. BEA Assocs., No. 98 Civ. 3725 (RWS), 2000 WL 45714, at *7 (S.D.N.Y. Jan. 19, 2000). Rather, to sufficiently plead a Section 36(b) claim, plaintiffs must allege facts which would satisfy the basic standard articulated in Gartenberg, "that the fees are disproportionately large, that they bear no reasonable relationship to the services rendered or that they could not have been the product of arm's-length bargaining."[21]   Wexler v. Equitable Capital Mgmt. Corp., No. 93 Civ. 3834 (RPP), 1994 WL 48807, at *4 (S.D.N.Y. Feb. 17, 1994). In short, "[t]o survive a motion to dismiss, a complaint may not simply allege in a

---

[21] Though dicta in Bjurman, Barry & Assocs. may support a different pleading standard, see id., 2004 WL 1903075, at *5 (noting that plaintiff's failure to plead general Gartenberg standard "is not a ground for dismissal"), in that case plaintiffs alleged facts showing that fees charged were disproportionately large compared to services rendered. To the extent it considered facts similar to those alleged here, we decline to adopt the reasoning of In re AllianceBernstein Mutual Fund Excessive Fee Litig., No. 04 Civ. 4885 (SWK), 2005 WL 2677753, at *4 (S.D.N.Y. Oct. 19, 2005) but rather find the analysis in Eaton Vance, 380 F. Supp.2d at 237-38, to be more compelling.

24

conclusory manner that advisory fees are 'excessive.' Instead, a plaintiff must allege facts that, if true, would support a claim that the fees at issue are excessive." Levy, 1998 WL 744005, at *2.

Both the advisory and Rule 12b-1 fees at issue here are subject to review under Section 36(b). See Meyer, 895 F.2d at 866; Eaton Vance, 380 F. Supp. 2d at 236-37. Considering these fees separately, as is appropriate,[22] we conclude that plaintiffs fail to allege facts which support the assertion that either of the fees was disproportionate to the services rendered.

Plaintiffs do not provide factual allegations to support their assertions that advisory fees were too high. Rather, plaintiffs rely on allegations regarding Rule 12b-1 fees, which are inappropriate to establish that the advisory fees were excessive. See Meyer, 895 F.2d at 866 (noting that advisory and Rule 12b-1 fees "are for entirely different services, namely advice on the one hand and sales and distribution on the other" and should not be "aggregated" to determine merits of Section 36(b) claim). In the end, plaintiffs' failure to allege facts that suggest anything about the relationship between the advisory fees and the services rendered is fatal to their claim.

---

[22] See Meyer, 895 F.2d at 866 (stating that Rule 12b-1 payments are not to be aggregated with advisory fees in determining the merits of Section 36(b) claim).

See <u>Levy v. Alliance Capital Mgmt. L.P.</u>, 1998 WL 744005, at *4; <u>Wexler</u>, 1994 WL 48807, at *4.

Plaintiffs' allegation that Rule 12b-1 fees were excessive fails for the same reason.[23]   Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.[24]   See <u>Kalish v. Franklin Advisers, Inc.</u>, 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990) ("Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies in scale must have been realized.   The courts reject that argument.").

---

[23] Plaintiffs also seem to allege that defendants failed to comply with other requirements of Rule 12b-1 and in doing so breached their fiduciary duties.   However, most of plaintiffs' allegations regarding compliance with Rule 12b-1 focus on the Trustee/Officer defendants. For the reasons discussed above, see <u>supra</u> Part III.A, these arguments are irrelevant because the Trustee/Officer defendants are not covered under Section 36(b).   In addition, such general allegations are not properly brought under Section 36(b).   See, e.g., <u>Strougo v. BEA Assocs.</u>, No. 98 Civ. 3725 (RWS), 1999 WL 147737, at *3 (S.D.N.Y. Mar. 18, 1999).

[24] The holding in <u>Wicks v. Putnam Investment Mgmt., LLC</u>, No. Civ. A. 04-10988, 2005 WL 705360, at *1 (D. Mass. Mar. 28, 2005), is consistent with this assertion, as in that case the court noted, among other things, that though fees had increased significantly over time, the quality of services rendered had not substantially changed.   In short, plaintiffs in that case at least met the pleading requirements of <u>Gartenberg</u>.
   Alternatively, plaintiffs respond that if no economies of scale were achieved, then the Rule 12b-1 fees yielded no benefits and therefore should have been discontinued.   Pl. Opp. at 32.   We find no support for the assertion that the failure to achieve economies of scale during the period in question necessarily would require such measures.

26

Nor do plaintiffs' allegations that Rule 12b-1 fees were charged despite the closing of various funds ("the Closed Funds") suffice.[25]    Though we are cognizant that literal compliance with National Association of Securities Dealers, Inc. "NASD") rules may not necessarily be sufficient to withstand a Section 36(b) claim, see Bjurman, Barry & Assocs., 2004 WL 1903075, at *5, we note that NASD Rule 2830 (d)(2) permits a closed fund to continue charging Rule 12b-1 fees so long as they do not exceed a specified cap.    Plaintiffs have not claimed that the Rule 12b-1 fees for the Closed Funds ever exceeded this cap. In addition, Rule 12b-1 fees are not limited to current marketing and distribution expenses.    See id., at *1 (noting that Rule 12b-1 also permits use of portion of assets to compensate broker-dealers for shareholder services such as account maintenance);[26]    ING Principal Prot. Funds Derivative

---

[25] Specifically, plaintiffs allege that "at least two Funds, the Goldman Sachs High Yield Municipal Fund and the Goldman Sachs Small Cap Value Fund, were closed to new investors . . . and, consequently, the so-called 12b-1 fees could not possibly have been used to market and distribute them.    Nevertheless, the Investment Adviser [d]efendants received Rule 12b-1 fees charged to the Closed Funds." SAC at ¶ 112.    Defendants counter that the GS Small Cap Value Fund was never closed during the Class Period and also point out that in the case of the only closed fund, plaintiffs have failed to specify the periods for which their allegations apply.    For purposes of this discussion, we assume plaintiffs' allegation is true.

[26] We also note that Bjurman, Barry & Assocs., 2004 WL 1903075, at *1 (granting defendants' motion to dismiss allegations of excessive administrative, transfer agent and "other" fees charged while a mutual fund was closed, but denying the motion with respect to marketing, distribution and service fees), does not support a different result here because plaintiffs in that case actually alleged that the Plan

27

Litig., 369 F. Supp.2d 163, 169 (D. Mass. 2005) ("SEC Rule 12b-1 permits fund-advisory firms to recover certain sales-related expenses previously paid out when distributing the fund's shares. Compensation for past distribution services are considered payments made 'in connection with' the distribution of a fund's shares."). Therefore, by merely asserting that Rule 12b-1 fees were charged while the funds at issue were closed to new investors, plaintiffs have not alleged that the fees charged were disproportionate to the services rendered.[27]

Finally, plaintiffs' allegations of "kickbacks" do not constitute support for their allegations of excessive Rule 12b-1 fees. Plaintiffs essentially argue that the fees were excessive because they were improper. Such assertions are insufficient to establish that the Rule 12b-1 fees bore no reasonable relationship to the services rendered.

In sum, plaintiffs have at most alleged that the advisory and Rule 12b-1 fees were used for improper purposes. We agree with Judge Koeltl and Judge Cederbaum that such allegations do not suffice to state a claim under Section 36(b). See Eaton Vance, 380 F. Supp. 2d at 237 ("The allegations that the

allowed charges only for reimbursement of actual expenses and that fees were disproportionate to services rendered.

[27] To the extent that plaintiffs' allegations can be interpreted to state that only the marketing and distribution portions of these Rule 12b-1 fees were improper, they still have failed to support these allegations in any way.

28

defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds." (citing Meyer, 895 F.2d at 866; Gartenberg, 694 F.2d at 928-29)); see also Davis, 2005 WL 2509732, at *2. Therefore, Count Three must be dismissed as against the Investment Adviser and Distributor defendants as well.

## IV. Failure to State a Claim Under Section 48(a) (Count Four)

Defendants move to dismiss Count Four on the ground that Section 48(a)[28] of the ICA does not provide an independent basis for liability. Under Section 48(a), liability is only imposed on those who controlled a person liable under the ICA. As discussed above, plaintiffs have failed to state a claim under Sections 34(b), 36(a), and 36(b) of the ICA, and therefore any

---

[28] Section 48(a) states in relevant part:

> It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder.

15 U.S.C. § 80a-47(a) (2005).

claim against Goldman Sachs for control person liability necessarily must fail. Accordingly, Count Four is dismissed.[29]

### V. Failure to State a Derivative Claim Under Section 215 of the IAA (Count Five)

Defendants move to dismiss Count Five on the ground that plaintiffs have failed to state a derivative claim under Section 215 of the IAA. Specifically, defendants assert that plaintiffs have failed to make a demand on the Fund Board prior to bringing their derivative claim, despite the fact that demand should not be excused as futile. Defendants also argue that plaintiffs have failed to plead their fraud claims with particularity, as required under Fed. R. Civ. P. 9(b).[30]

Plaintiffs concede that no demand was made on the Board of Trustees prior to commencing this action for their derivative claim. SAC at ¶ 148. Therefore, plaintiffs are required to plead with particularity why a demand would be futile. See Rales v. Blasband, 634 A.2d 927, 932-33 (Del. 1993); Fed R. Civ. P. 23.1; Del. Ch. R. 23.1.[31] In determining whether plaintiffs have adequately pled futility, courts must assess whether a

---

[29] As noted above, see supra n.7, the lack of a private right of action under Section 48(a) provides an additional ground for dismissal.

[30] Because we conclude that failure to bring pre-suit demand renders plaintiffs without standing to bring their claim, we need not consider defendants' arguments regarding pleading requirements under Rule 9(b).

[31] We agree with the parties that Delaware law governs here. See Kamen, 500 U.S. at 108-09.

reasonable doubt has been created that:  "(1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment" (the "Aronson test").  Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 (Del. 2000); see Levine v. Smith, 591 A.2d 194, 205 (Del. 1991), overruled on other grounds by Brehm, 746 A.2d at 253.[32]

## A. Disinterested and Independent Board

Under the first prong of the Aronson test, plaintiffs must plead "with particularity, facts sufficient to create a reasonable doubt that . . . a majority of the directors are disinterested and independent" Ash v. McCall, No. Civ. A. 17132, 2000 WL 1370341, at *6 (Del. Ch. Sept. 15, 2000) (citing Aronson, 473 A.2d at 814).

### 1. Disinterested

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."  Rales, 634 A.2d at

---

[32] Plaintiffs argue that the test articulated in Rales, 634 A.2d at 933-34, which applies to situations of board inaction, should also be weighed in making this determination.  We disagree because the dispute in this case concerns actions taken and approved by the board. Even if this were not the case, however, as the Rales test and the Aronson test embody similar concerns, see In re Oracle Corp. Derivative Litig., 824 A.2d 917, 939 (Del. Ch. 2003) ("In simple terms, these tests permit a corporation to terminate a derivative suit if its board is comprised of directors who can impartially consider a demand."), we see no reason why they would lead to different results.

936. Such personal benefit must be "of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the [corporation's] shareholders without being influenced by her overriding personal interest . . . ." In re General Motors Class H S'holders Litig., 734 A.2d 611, 617 (Del. Ch. 1999). Under Delaware law, trustees who are not "interested" under the ICA "shall be deemed independent and disinterested for all purposes." See Del. Code Ann. Tit. 12, § 3801(h) (2005).

Plaintiffs assert that the Trustee/Officer defendants were self-interested in making the improper payments to brokers because they had an incentive to increase the Funds' assets to protect their seats on the Board. Id. at ¶¶ 153, 155. In addition, they allege that the Trustee/Officer defendants committed the wrongdoing at issue and thus could not be expected to "sue themselves and their fellow Trustee/Officers." Id. at ¶ 156. Finally, plaintiffs assert that the substantial payments and benefits the Trustee/Officer defendants received as a result of their Board membership establish self-interest. Id. at ¶ 154.

Plaintiffs' allegations are insufficient to excuse the demand requirement. An allegation that the Trustees were motivated by a desire to retain their positions does not

32

establish that the Trustees were interested.  See RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991).  Similarly, allegations that the Trustee/Officer defendants themselves committed the wrongdoing are insufficient.  See Citron v. Daniell, 796 F. Supp. 649, 652 (D. Conn. 1992) ("Allegations that the directors engaged in the conduct at issue in order to retain their positions is likewise insufficient to establish futility.").  Nor is it enough to argue that the Trustees are disinclined to sue themselves.  See Aronson, 473 A.2d at 818 (dismissing a similar "bootstrap argument" and noting that accepting such an assertion would "effectively abrogate Rule 23.1").  Furthermore, mere allegations of substantial compensation are insufficient.  See Jacobs v. Yang, No. Civ. A. 206-N, 2004 WL 1728521, at *4 (Del. Ch. Aug. 2, 2004); see also Fink v. Komansky, No. 03 CV 0388 (GBD), 2004 WL 2813166, at *7 (S.D.N.Y. Dec. 8, 2004).

## 2. Independent

In order to raise a reasonable doubt regarding director independence, plaintiffs must allege facts which demonstrate that "the directors are beholden to the controlling person." Aronson, 473 A.2d at 815-16.  Plaintiffs allege that each of the Trustee/Officer defendants was appointed by the Investment Adviser defendants and is "controlled by and beholden to the Investment Adviser [d]efendants for his or her positions and

substantial compensation." SAC at ¶ 149. In lieu of any factual support for these assertions, plaintiffs state only conclusory allegations and therefore fail to raise a reasonable doubt that a majority of the directors were independent. Therefore, plaintiffs fail to satisfy the first prong of the Aronson test.[33]

## B. Valid Exercise of Business Judgment

Plaintiffs have also failed to raise a reasonable doubt that the Board's actions were the product of a valid exercise of business judgment. Plaintiffs do not allege any facts which would overcome the presumption that the Board is entitled to the protections of the business judgment rule. See Greenwald v Batterson, No. 16475, 1999 WL 596276, at *7 (Del. Ch. July 26, 1999); Benerofe v. Cha, C.A. No. 14614, 1996 WL 535405, at *8 (Del. Ch. Sept. 12, 1996).

Accordingly, having failed to establish futility, plaintiffs' Section 215 claim is dismissed in light of their failure to bring a pre-suit demand.

---

[33] The holding of In re Oxford Health Plans, Inc., 192 F.R.D. 111, 114 (S.D.N.Y. 2000), a non-mutual fund case in which the court described the complaint as stating "a claim for breach of fiduciary duty, gross mismanagement and waste," is not inconsistent with these findings.

34

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted in its entirety, and all claims against defendants are dismissed.

**SO ORDERED.**


Dated:     New York, New York
           January 13, 2006

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

<u>Counsel for Plaintiffs</u>

Jerome M. Congress, Esq.
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
New York, NY 10119

<u>Counsel for Defendants The Goldman Sachs Group, Inc., Goldman Sachs Asset Management, L.P., Goldman Sachs Asset Management International, Goldman, Sachs & Co., James McNamara, Alan A. Shuch, Kaysie P. Uniacke, John M. Perlowski, Philip V. Giuca, Jr., Peter Fortner, Kenneth G. Curran, James A. Fitzpatrick, Jesse Cole, Kerry K. Daniels, Mary F. Hoppa, Christopher Keller, Howard B. Surloff, Dave Fishman, Danny Burke, Elizabeth D. Anderson and Amy E. Curran</u>

Richard H. Klapper, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

<u>Counsel for Defendant Gary D. Black</u>

David S. Hoffner, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112

<u>Counsel for Defendants Ashok N. Bakhru, Patrick T. Harker, Mary P. McPherson, Wilma J. Smelcer, Richard P. Strubel, Goldman Sachs Trust, Goldman Sachs Variable Insurance Trust and the Goldman Sachs Funds as Identified at Exhibit A of Plaintiffs' Complaint</u>

Charles D. Donohue, Jr.
140 Broadway, 39th Floor
New York, NY 10005

36